IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

DIETRICH C. JORDAN                                                                                                    PLAINTIFF

        v.                              Civil No. 11-2149

MICHAEL J. ASTRUE, Commissioner
Social Security Administration                                                                                    DEFENDANT

**MEMORANDUM OPINION**

Plaintiff, Dietrich Jordan, brings this action under 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of Social Security Administration (Commissioner) denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act (hereinafter "the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). In this judicial review, the court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. *See* 42 U.S.C. § 405(g).

**I.    Procedural Background:**

The plaintiff filed her application for SSI on September 21, 2009, alleging disability due to aplastic anemia[1], bone and joint pain, headaches, and hypertension,. Tr. 10, 15, 168-174, 201, 216-217, 233, 242, 246. Her applications were denied initially and on reconsideration. Tr. 10, 67-68, 86-89, 93-94.

An administrative hearing was held on September 28, 2010. Tr. 27-66. Plaintiff was present and represented by counsel. At this time, plaintiff was 33 years of age and possessed the equivalent of a high school education. Tr. 35. Plaintiff indicated that she had also attended college for approximately

---

[1]Aplastic anemia is a condition that occurs when your body stops producing enough new blood cells, rendering it more susceptible to disease. Mayo Clinic, *Aplastic Anemia*, http://www.mayoclinic.com/health/aplastic-anemia/DS00322 (Last visited July 25, 2012). Symptoms include, fatigue, shortness of breath with exertion, rapid or irregular heart rate, pale skin, frequent or prolonged infections, unexplained or easy bruising, nosebleeds and bleeding gums, prolonged bleeding from cuts, skin rash, dizziness, and headaches. *Id*. Treatment for aplastic anemia may include medications, blood transfusions or a stem cell transplant. *Id*.

two semesters, but obtained no degree or certification. Tr. 35. And, although she had previously worked in the fast food industry, she had no experience that qualified as past relevant work ("PRW") experience. Tr. 15, 63, 208, 248-249.

On December 15, 2010, the Administrative Law Judge ("ALJ") concluded that, although severe, Plaintiff's aplastic anemia in remission, headaches, and hypertension did not meet or equal any Appendix 1 listing. Tr. 12. He found that Plaintiff maintained the residual functional capacity ("RFC") to

> lift and carry 20 pounds occasionally and 10 pounds frequently. The claimant can sit for about 6 hours during an eight-hour workday. The claimant can occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl. The claimant cannot climb ladders, ropes or scaffolds. The claimant is to avoid even moderate exposure to extreme temperatures. The claimant can understand, remember, and carry out simple, routine, and repetitive tasks. The claimant can respond appropriately to supervisors, co-workers, the general public, and usual work situations.

Tr. 12-15. With the assistance of a vocational expert, the ALJ then found that plaintiff could still perform work as a fast food worker, cashier II, and waiter. Tr. 16.

Plaintiff appealed this decision to the Appeals Council, but said request for review was denied on July 25, 2011. Tr. 1-6. Subsequently, plaintiff filed this action. Doc. # 1. This case is before the undersigned by consent of the parties. Both parties have filed appeal briefs, and the case is now ready for decision. Doc. # 10, 11.

**II.    Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by substantial evidence on the record as a whole. *Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Id*. "Our review extends beyond examining the record to find substantial evidence in support of the ALJ's decision; we also consider evidence in the record that fairly detracts from that decision." *Id*. As long as there is substantial evidence in the record to support the Commissioner's decision, the court may not reverse the decision simply because substantial

evidence exists in the record to support a contrary outcome, or because the court would have decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001). If we find it possible "to draw two inconsistent positions from the evidence, and one of those positions represents the Secretary's findings, we must affirm the decision of the Secretary." *Cox*, 495 F.3d at 617 (internal quotation and alteration omitted).

It is well-established that a claimant for Social Security disability benefits has the burden of proving her disability by establishing a physical or mental disability that has lasted at least one year and that prevents her from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § § 423(d)(3), 1382(3)(c). A plaintiff must show that her disability, not simply her impairment, has lasted for at least twelve consecutive months.

### A. The Evaluation Process:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his or her claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing PRW; and, (5) whether the claimant is able to perform other work in the national economy given his or her age, education, and experience. *See* 20 C.F.R. § § 404.1520(a)- (f)(2003). Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work experience in light of his or her RFC. *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. § § 404.1520, 416.920 (2003).

### III. Evidence Presented:

Before addressing the evidence, the Court deems it important to note that the relevant time period in this case is limited. SSI may not be granted prior to a claimant's application filing date, because benefits through an SSI application are allowed only after all regulatory criteria are established, namely after the SSI application is filed. *See* 20 C.F.R. § 416.335; *Jernigan v. Sullivan*, 948 F.2d 1070, 1072 n. 3 (8th Cir. 1991). Therefore, plaintiff must prove that her disability commenced on or after September 21, 2009, the date she filed her application, and continued through December 15, 2010, the date of the ALJ's decision.

Plaintiff's attorney notes that she was previously awarded benefits based on her diagnosis of aplastic anemia, which subsequently went into remission. Thus, Plaintiff's case centers around the residual effects the treatment for aplastic anemia (*i.e.,* chemotherapy and radiation) has had on her body, namely osteoporosis, pain, and chronic headaches. Tr. 37.

Prior to the relevant time period, Plaintiff was treated for aplastic anemia, neck pain (cervicalgia) secondary to an automobile accident, muscle spasms, dyspnea with associated chest pain, headaches, an upper respiratory infection/sinusitis, hypertension, body aches, and abdominal pain. Tr. 286-304, 337-343, 352-407. She was prescribed various medications including Diltiazem, HCTZ, and Fioricet. An EKG performed on September 7, 2009, was abnormal, suggestive of an anterior infarct. Tr. 374. However, Plaintiff did not seek further treatment for this condition.

On October 20, 2009, Plaintiff underwent a general physical exam with Marie Pham-Russell, an Advanced Practical Nurse working with Dr. Stephanie Frisbie at the Sophia Mayer Family Medicine Clinic. Tr. 266-269. Plaintiff complained of joint, chest, back, and knee pain, as well as numbness in her left arm. She also reported a history of hypertension, aplastic anemia, and migraine headaches. An examination revealed no evidence of muscle spasm, a normal neurological exam, a negative straight leg raise test bilaterally, no muscle weakness or atrophy, no sensory abnormalities, and a steady gait.

4

Further, Plaintiff exhibited a normal range of motion in all areas, and no evidence of psychosis was noted. Ms. Pham-Russell diagnosed Plaintiff with hypertension, headache, and a history of aplastic anemia in remission since 1995. She concluded Plaintiff would have no physical limitations resulting from these impairments, but indicated that she should probably avoid working in extreme temperatures, such as a cold environment. This assessment was affirmed by Dr. Frisbie, as it also bears her signature. Tr. 266-269.

On March 29, 2010, Plaintiff presented in the emergency room at St. Edward's Mercy Medical Center with complaints of chronic intermittent joint pain and abdominal pain. Tr. 314-331. Plaintiff reported a history of aplastic anemia, for which she was prescribed chemotherapy, radiation, and multiple blood transfusions. Although she was currently in remission, Plaintiff indicated that she had begun experiencing chronic pain after her treatments were concluded. However, she had undergone no medical assessment during this time, due to her financial status. Plaintiff also reported being turned down by Medicaid. Her pain was primarily in her knees, right shoulder, right elbow, and right hip. She also complained of worsening pain and cramps with her periods and some pain in the area of the scar from her tubal ligation. Her only current medication was Diltiazem. A physical exam revealed no acute distress, a full range of motion in all joints, and the ability to stand and move well. Dr. William King could find no objective signs of joint problems. Her abdomen revealed a well healed pfannenstiel type incision in the suprapubic area without any hernias or redness or swelling there and some mild suprapubic abdominal tenderness without rebound or guarding. A complete blood count was done and was essentially normal. Dr. King diagnosed Plaintiff with chronic joint pain of uncertain etiology and a history of aplastic anemia currently in remission of unknown etiology. He then advised Plaintiff to follow-up with her primary care physician regarding her chronic pain. Due to Plaintiff's financial situation, he recommended she look at the Good Samaritan Clinic, although they typically dealt more with people who were underinsured rather than those with no insurance at all. Dr. King prescribed

Tramadol and Diclofenac DR, noting that these were temporary medications and that she needed to follow-up for longer-term care. Tr. 314-331.

On April 28, 2010, Plaintiff was treated by Dr. David Foscue. Tr. 333-336. She complained of headaches, bilateral arm numbness, aching to both legs, joint stiffness, and shoulder pain. Plaintiff reported that her legs swelled after standing for prolonged periods. She also voiced problems with excessive crying and depression. An examination revealed bilateral shoulder, elbow, wrist, and knee tenderness. Dr. Foscue diagnosed Plaintiff with situational depression, aplastic anemia, limb pain, and arthralgias. He ordered lab tests and prescribed Cardizem, Voltaren, and Ultram. Tr. 333-336.

On May 3, 2010, Plaintiff was assessed by Jerry Stearman, a licensed psychological examiner at Western Arkansas Counseling and Guidance Center. Tr. 308-312. Mr. Stearman diagnosed Plaintiff with major depressive disorder and adjustment disorder. He assessed her with a global assessment of functioning score of 57, indicative of moderate symptoms or moderate difficulty in social, occupational, or school functioning. Plaintiff's goal was to reduce the number of days per week she ranks her psychological symptoms as a 6 or less on a 10-point scale from 0 days to 7 days. Tr. 308-312.

On May 14, 2010, Plaintiff underwent a diagnostic evaluation with Mr. Stearman. Tr. 306-307, 349-350. Plaintiff admitted she was depressed, stating it was a "family thing." She also reported suffering from a type of anemia that caused her joints to ache and pop/crack. Plaintiff indicated that she received a great deal of pressure to go out and do things such as skate and bowl, but that she was not physically able to do so. This caused her to experience periods of irritability. Sleep was also reportedly difficult for her. Plaintiff had also suffered a miscarriage approximately one year prior, and was experiencing a great deal of stress. Further, Plaintiff reported a history of molestation and rape as a teenager. Tr. 306-307, 349-350.

Mr. Stearman noted that Plaintiff was tearful during the interview. Tr. 306-307, 349-350. She stated that she was staying with her parents, caring for a physically ill mother and a father suffering from

(Rev. 8/82)

cancer. Mr. Stearman diagnosed Plaintiff with major depressive disorder and adjustment disorder. He recommended Plaintiff return to try medication and receive a psychiatric evaluation. However, because Plaintiff was primarily in town visiting, he was not certain she would follow-up. Tr. 306-307, 349-350.

On June 1, 2010, Camellia Pittman, Plaintiff's aunt, stated that Plaintiff frequently complained of pain in her legs and arms, slept "all the time" due to pain, experienced pain when walking, and experienced difficulty walking or standing for long periods of time. Tr. 255.

On June 3, 2010, Shirley Jordan, Plaintiff's mother, completed a third party statement. Tr. 252. She indicated that Plaintiff cried without cause during a normal conversation, often complained of headaches, and was easily frustrated. Ms. Jordan also reported that Plaintiff slept a lot, yet constantly complained of being tired. Her hands and feet were prone to swell, and you could sometimes hear her bones pop when she walked across the room. During her monthly cycle, Ms. Jordan stated that Plaintiff's cramps were so severe that she cried. Tr. 252.

This same date, Plaintiff's father, James Jordan, also completed a third party statement. Tr. 253. He stated that Plaintiff experienced many physical problems when she stood or walked. Mr. Jordan indicated that her bones cracked and pooped, her legs and ankles swelled, and she experienced constant pain in her entire body. He also reported that she slept excessively during the day and cried a lot. Tr. 253.

Lundell Bell, Plaintiff's Grandmother completed a third party statement as well. Tr. 254. She described her observations of Plaintiff's physical and mental condition as follows: swelling of her (bones) joints, joints hurting, frequent bad headaches, complaints of fatigue and lack of energy, and swelling in her hands and feet. Tr. 254.

Further, Garnette Bell, Plaintiff's great aunt, reported that Plaintiff always had a headache and complained of pain in her legs and knees. Tr. 2256. She indicated that it was difficult for Plaintiff to walk or stand, and her bones always cracked and popped when she got or moved around. Ms. Bell also

AO72A
(Rev. 8/82)

stated that "bad bruises" sometimes appeared on Plaintiff's body, and that she was always tired and had to lie down. Tr. 256.

On June 17, 2011, Plaintiff reported problems with fatigue and joint pain to both hands and to the long bones of her arms and legs. Tr. 408-411. She also complained of lethergy, cold intolerance, indigestion/heartburn, abdominal cramps, constipation, gas, urinary frequency, blurred vision, dizzy spells, balance problems, numbness/tingling/weakness in leg or arm, and memory loss. She indicated that this pain was previously associated with her diagnosis of aplastic anemia and wondered if her illness was no longer in remission. An examination revealed no notable deformity of the hands or joint tenderness, but she was tender along the humerus of both arms. Dr. Lindsey Walley diagnosed her with pain in multiple sites and administered a Toradol injection. She also prescribed Tramadol. Tr. 408-411.

### IV. **Discussion**:

Plaintiff contends that the ALJ erred by failing to find her depression to be a severe impairment; failing to develop the record as it relates to her mental limitations; relying on the general physical exam conducted by Marie Pham-Russell, as she is a nurse practitioner and not an acceptable medical source; concluding she could perform a range of light work, as this RFC makes no provision for medication side effects or the headaches Plaintiff experiences; and, failing to submit a properly phrased hypothetical question to the vocational expert. We will begin our analysis with a review of the medical evidence and Plaintiff's subjective complaints.

#### A. **Subjective Complaints:**

An ALJ may not disregard a claimant's subjective complaints solely because the objective medical evidence does not fully support them. *See Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ is required to take into account the following factors in evaluating the credibility of a claimant's subjective complaints: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) dosage, effectiveness, and side effects of medication; (4) precipitating and

8

aggravating factors; and (5) functional restrictions. *See id.* The ALJ must make express credibility determinations and set forth the inconsistencies in the record which cause him to reject the plaintiff's complaints. *Masterson v. Barnhart,* 363 F.3d 731, 738 (8th Cir.2004). However, the ALJ need not explicitly discuss each *Polaski* factor. *Strongson v. Barnhart,* 361 F.3d 1066, 1072 (8th Cir.2004). The ALJ only need acknowledge and consider those factors before discounting a claimant's subjective complaints. *Id.* Even so, the ALJ may discount a claimant's subjective complaints if there are inconsistencies between the alleged impairments and the evidence as a whole. *Dunahoo v. Apfel*, 241 F.3d 1033, 1037 (8th Cir. 2001); *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).

After reviewing the entire transcript in this case, the undersigned finds that the ALJ properly assessed Plaintiff's credibility. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)(questions of credibility are for the ALJ in the first instance – if an ALJ explicitly discredits a claimant's testimony and gives good reason for doing so, court will normally defer to that judgment). As detailed in the previous section, Plaintiff did not seek out consistent treatment for any of her alleged impairments. *See Edwards v. Barnhart*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). In fact, she sought out treatment for her physical impairments on only three occasions during the relevant time period. A general physical exam conducted by Nurse Pham-Russell in October 2009 revealed no muscle atrophy, sensory abnormalities, range of motion limitations, or neurological deficits. Tr. 266-269. An emergency room exam in March 2010, also showed a full range of motion in all joints and no objective signs of joint problems. Tr. 314-331. Further, Dr. Walley's examination in June 2011 revealed no notable deformity of the hands or joint tenderness, only tenderness along the humerus of both arms. Tr. 408-411.

Based on the records before us, it also appears that Plaintiff was only prescribed conservative measures for her condition, namely pain medication. *See Smith v. Shalala*, 987 F.2d 1371, 1374 (8th Cir.

9

1993) (holding that treating physician's conservative treatment was inconsistent with plaintiff's allegations of disabling pain). However, she did not receive a long-term prescription for pain medication, as we would have expected to see with a patient who was suffering from chronic, disabling pain. Thus, it seems clear to the undersigned that the objective evidence simply does not support Plaintiff's contention of disability due to pain and/or osteoarthritis. *See Forte v. Barnhart*, 377 F.3d 892, 895 (8th Cir. 2004) (holding that lack of objective medical evidence is a factor an ALJ may consider).

As for her alleged chronic headaches, Plaintiff testified that she had been told that her headaches were caused by her high blood pressure. At the time of her evaluation with Nurse Pham-Russell, her blood pressure reading was 130/90. In March 2010, her blood pressure reading was 142/89, but no diagnosis of hypertension was made. Tr. 314-331. At this time, Plaintiff indicated that she had been prescribed Diltiazem, but only took it when she needed it, reporting that her last dose was the previous week. Tr. 319. In April 2010, Dr. Foscue noted that her blood pressure was 148/80. Again, she received no diagnosis of hypertension, although she was prescribed Diltiazem to be taken twice daily. Tr. 333, 335. A little over one year later, at Plaintiff's next medical exam, her blood pressure was 142/83. Tr. 409. At this time, she was reportedly taking Diltiazem. Tr. 410. It seems clear that Plaintiff was still taking the medication "as needed," rather than as prescribed. Had she been taking it as prescribed and her blood pressure continued to be above normal, doctors would have adjusted her dose of medication to get her blood pressure under better control, thus alleviating her headaches. Thus, we find that Plaintiff's history of only taking the blood pressure medication when she felt she needed it weighs against her claim of disability due to hypertension and chronic headaches. *See Guilliams v. Barnhart*, 393 F.3d 798, 802 (8th Cir. 2005) ("A failure to follow a recommended course of treatment . . . weighs against a claimant's credibility."). Further, we can find no evidence to indicate that her hypertension was so severe as to warrant hospitalization or consistent emergency room treatment, such that it would impact her ability to perform work-related activities.

10

Additionally, Plaintiff complained of headaches on only two occasions during the relevant time period. 266-269, 333-336. *See Edwards*, 314 F.3d at 967 (holding that ALJ may discount disability claimant's subjective complaints of pain based on the claimant's failure to pursue regular medical treatment). Had her headaches been as chronic and severe as alleged both by Plaintiff and her family members, we believe Plaintiff would have sought out more consistent treatment. We also note that there is no evidence that objective tests were ever ordered to determine the cause of Plaintiff's headaches (*i.e.*, CT scan or MRI), rendering her allegations of disabling headaches further suspect.

Plaintiff's reported daily activities are also inconsistent with her report of disability. On October 19, 2009, Plaintiff completed an adult function report stating that she cared for her personal hygiene (depending on fatigue and pain level); prepared simple meals; cleaned; ironed; washed the laundry; went outside once or twice per day; walked; drove a car; rode in a car; went out alone; shopped in stores for household, personal, and food items; payed bills; counted change; handled a savings account; used a checkbook; watched television; fished rarely; chatted on the phone daily; visited with friends and family twice per week; and, attended church once per week. Tr. 218-225. At the administrative hearing, she also reported washing dishes, making her bed, and sweeping. Tr. 42, 52-54. *See Leckenby v. Astrue*, 287 F.3d 626, 634 (8th Cir. 2007) (In evaluating RFC, consideration should be given to the quality of daily activities, the ability to sustain activities, and the frequency, appropriateness, and independence of activities).

After reviewing the entire transcript in this case, the undersigned finds that the ALJ properly assessed Plaintiff's credibility. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)(questions of credibility are for the ALJ in the first instance – if an ALJ explicitly discredits a claimant's testimony and gives good reason for doing so, court will normally defer to that judgment). The lack of objective evidence to support her allegations, coupled with her history of inconsistent treatment, failure to take her

11

blood pressure medication as prescribed, and reported daily activities call her subjective complaints into question.

While do not doubt that Plaintiff suffers from some degree of pain, we note that the standard of evaluation is not whether Plaintiff experiences pain, but whether that pain is intense enough to cause functional limitations. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (holding that the real issue is not whether the plaintiff is experiencing pain, but how severe and whether it prevents him from performing any kind of work). We simply do not believe that evidence of record supports Plaintiff's allegations of disabling pain.

B. **Non-Severe Impairments:**

Plaintiff contends that the ALJ erred by failing to find her depression to be a severe impairment. However, Plaintiff did not allege depression in her application documents, and did not allege symptoms associated with depression until the September 2010 hearing. Tr. 48-49, 201, 242, 321. *See Dunahoo v. Apfel*, 241 F.3d 1033, 1039 (8th Cir. 2001) (fact that claimant did not allege depression on benefits application is significant even if evidence of depression was later developed). Plaintiff did report depressive symptoms to Dr. Foscue, but his ultimate diagnosis was situational depression. Tr. 333-336. Plaintiff also told the examiner at Western Arkansas Counseling and Guidance Center that she was depressed, but it was a "family thing." *See Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (finding situational depression not severe under similar circumstances). Further, although the examiner recommended that Plaintiff follow up for medication and counseling, Plaintiff failed to return for further treatment or to seek out mental health treatment elsewhere. And, she was never treated for her alleged depression. *See Holland v. Apfel*, 153 F.3d 620, 622 (8th Cir. 1998) (holding that lack of evidence of ongoing treatment for depression supported determination that claimant failed to meet the second prong of § 12.05(c)). Accordingly, substantial evidence supports the ALJ's conclusion that Plaintiff's mental impairment was not severe. *See Bowen v. Yuckert,* 482 U.S. 137, 153 (1987) (O'Connor, J., concurring)

12

(holding that an impairment is not severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities).

### C. Failure to Develop the Record:

Plaintiff also alleges that the ALJ failed to develop the record properly concerning her depression, given that she did present at Western Arkansas Counseling and Guidance Center on two occasions. However, as noted above, her failure to assert depression as a consistent problem and to maintain a consistent regimen of treatment for her impairment prevents us from concluding that the ALJ's failure to order a consultative mental evaluation was improper. Had Plaintiff's depression been as severe as alleged, we believe Plaintiff would have returned to Western Arkansas Counseling and Guidance Center or obtained mental health treatment from another source. Her failure to do so signifies that her symptoms were not severe and did not significantly impact her ability to perform daily activities.

When the record is developed sufficiently to allow the ALJ to make an informed decision, as is the case here, a consultative examination at the government's expense is not required. *Matthews v. Bowen*, 879 F.2d 422, 424 (8th Cir. 1989) (ALJ not required to order consultative evaluation of every alleged impairment, he simply has the authority to do so if the existing medical sources do not contain sufficient evidence to make an informed decision); 20 C.F.R. § 416.912(e).

At any rate, we note that the ALJ did take her alleged symptoms into consideration when concluding that she could understand, remember, and carry out simple, routine, and repetitive tasks and respond appropriately to supervisors, co-workers, the general public, and usual work situations. This determination is further bolstered by Plaintiff's own admission that she follows written instructions well, gets along well with authority figures, is able to attend church weekly, can shop in stores, chats on the phone daily, and visits with friends and family twice per week. Tr. 218-224. Accordingly, even if the ALJ's failure to order a consultative exam was error, Plaintiff can show no prejudice. *See Haley v. Massanari*, 258 F.3d 742, 748 (8th Cir. 2001) (reversal due to failure to develop the record is only

13

warranted where such failure is unfair or prejudicial). Accordingly, the ALJ's determination will stand.

### D. Financial Hardship:

There is some mention in the record that Plaintiff's failure to obtain more consistent treatment was due to her lack of financial resources and medical insurance. Tr. 50. She also indicated that she had been turned down by Medicaid. Tr. 50. However, in 2010, Dr. King recommended she look into the services offered at the Good Samaritan Clinic. Although he expressed some concern that Plaintiff might not be applicable for services through this clinic, as she was not underinsured, rather uninsured, there is no evidence to indicate that Plaintiff ever even contacted the Good Samaritan Clinic to determine her applicability. A review of their website indicates that they provide services for low-income working uninsured people, their families, the homeless, and people who are "facing extraordinary life circumstances." *See* http://good-sam-clinic.net/good-samaritan-clinic/ (Last accessed July 20, 2012). They also state their "ministry is intended to help low-income people without insurance receive the medical care, prescriptions, and advice they need when they cannot afford treatment elsewhere." *Id*.

We are well aware that a lack of funds may justify a person's failure to obtain medical care or to follow medical advice. *Osborne v. Barnhart,* 316 F.3d 809, 812 (8th Cir. 2003). However, a lack of funds alone will not suffice. The Secretary's regulations provide that a claimant who fails to treat a remediable condition without good reason is barred from entitlement to benefits. 20 C.F.R. § 404.1518 (1980); 20 C.F.R. § 404.1530 (1983). Generally speaking, a lack of evidence that the claimant attempted to find any low cost or no cost medical treatment for her alleged pain and disability is inconsistent with a claim of disabling pain. *Murphy v. Sullivan,* 953 F.2d 383, 386-87 (8th Cir. 1992). Accordingly, Plaintiff's failure to contact Good Samaritan Clinic or any other clinics offering services to the uninsured or underinsured prevents us from concluding that her financial hardship excuses her failure to obtain consistent treatment. We also note that the record contains no evidence to indicate that Plaintiff was ever turned down for treatment due to her inability to pay for services.

14

E.  **Evaluation of Nurse Practitioner, Marie Pham-Russell's Assessment:**

Plaintiff also contends that the ALJ improperly relied on the a physical exam and assessment of Marie Pham-Russell, as she was not an acceptable medical source. The Social Security Regulations provide a detailed explanation of how the Commissioner evaluates and weighs medical opinion evidence. See 20 C.F.R. §§ 404.1527(d), 416.927(d). The phrase "acceptable medical source" is a term of art precisely defined by the Agency in 20 C.F.R. § 416.902. Acceptable medical sources are licensed physicians (medical or osteopathic doctors) and licensed or certified psychologists. 20 C.F.R. § 416.913(a). Medical opinions are statements from a physician, psychologist, or other acceptable medical source that reflect a judgment about the nature and severity of a claimant's impairment, including symptoms, diagnosis, prognosis, and what a person can still do despite those impairments. 20 C.F.R. § 416.927(a)(2). Only "acceptable medical sources" can establish the existence of a medically determinable impairment. *See* 20 CFR 404.1513(a) and 416.913(a). Evidence from "other sources," such as nurse practitioners, can be used to show the severity of the individual's impairment(s) and how it affects the individual's ability to function. Social Security Ruling (SSR) 06-03p, 2006 WL 2329939, *2 (August 6, 2006).

The medical source that the agency selects may use support staff to help perform the consultative examination. 20 C.F.R. § 416.919g(c). Thus, although Nurse Pham-Russell was not an acceptable medical source, she fit the criteria of "other" medical sources, and was an appropriate source of evidence regarding the severity of Plaintiff's impairment, and the effect of the impairment on a her ability to work. Further, the fact that her assessment was reviewed and endorsed by her supervisor, Dr. Frisbie, indicates that she was working as a part of a treatment team, entitling her opinion to greater weight than it would have standing alone. *Shontos v. Barnhart*, 328 F.3d 418, 426 (8th Cir. 2003). Accordingly, the ALJ committed no error in relying on Nurse Pham-Russell's and Dr. Frisbie's evaluation and assessment.

AO72A
(Rev. 8/82)

### F. The ALJ's RFC Assessment:

We next examine the ALJ's RFC assessment. RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1). A disability claimant has the burden of establishing his or his RFC. *See Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir.2004). "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or his limitations." *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004); *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704 (8th Cir. 2001). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v. Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).

The ALJ properly considered plaintiff's subjective complaints, the objective medical evidence, and the RFC assessments of the non-examining, consultative doctor. On October 26, 2009, Dr. Jerry Mann completed a physical RFC assessment. Tr. 274-281. After reviewing Plaintiff's medical records, he concluded that Plaintiff had no exertional or postural limitations. He did, however, indicate that she should avoid even moderate exposure to extreme heat and cold. Tr. 274-281. This assessment was affirmed by Dr. Bill Payne on December 22, 2009. Tr. 282-284.

As previously noted, none of the doctors who actually examined Plaintiff found any significant physical limitations. She exhibited a full range of motion in all areas, no neurological deficits, no muscle atrophy, no muscle spasm, and no sensory deficits. Giving Plaintiff the benefit of the doubt, though, the ALJ concluded she could perform a range of light work requiring only occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, and crawling; no climbing of ladders, ropes, or

scaffolds; and no moderate exposure to extreme temperatures. He also concluded that she could carry out simple, routine, and repetitive tasks and respond appropriately to supervisors, co-workers, the general public, and usual work situations. For all of the reasons previous mentioned in this opinion, the undersigned finds that substantial evidence supports the ALJ's RFC determination.

### G. Vocational Expert's Testimony:

Testimony from a vocational expert ("VE") based on a properly-phrased hypothetical question constitutes substantial evidence. *See Cruze v. Chater,* 85 F.3d 1320, 1323 (8th Cir. 1996); *cf. Hinchey v. Shalala,* 29 F.3d 428, 432 (8th Cir. 1994) (when hypothetical question does not encompass all relevant impairments, VE's testimony does not constitute substantial evidence to support the ALJ's decision). The ALJ's hypothetical question needs to "include only those impairments that the ALJ finds are substantially supported by the record as a whole." *Id.* (citing *Stout v. Shalala,* 988 F.2d 853, 855 (8th Cir.1993)); *see also Morse v. Shalala,* 32 F.3d 1228, 1230 (8th Cir.1994).

Plaintiff argues that the VE's testimony is flawed because in response to an interrogatory that included more limitations than those the ALJ deemed were supported by the record, the expert indicated that there would be no jobs available in the national economy. However, the vocational expert indicated that a person of plaintiff's age, education, and work background with the aforementioned RFC, could still perform work as a fast food worker, cashier II, and waitress. Tr. 61. Because the ALJ's hypothetical question included those impairments that were substantially supported by the record, we find that the question was proper and the ALJ was entitled to rely upon the expert's answer.

### V. Conclusion:

Accordingly, having carefully reviewed the record, the undersigned finds substantial evidence supporting the ALJ's decision denying the plaintiff benefits, and thus the decision should be affirmed. The undersigned further finds that the plaintiff's Complaint should be dismissed with prejudice.

17

DATED this 31st day of July 2012.

/s/ *J. Marschewski*
HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE